UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LORI HAHN,                                          :

                      Plaintiff,        :        12 Civ. 4151 (DF)

        -against-                            :        **MEMORANDUM
                                                              AND OPINION**

BANK OF AMERICA INC.,                    :
and MARIA LOCCISANO,
                                                    :
              Defendants.
------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

      In this employment discrimination case, which is before me on consent pursuant to

28 U.S.C. § 636(c), plaintiff Lori Hahn ("Plaintiff" or "Hahn") has asserted discrimination and

retaliation claims against her former employer, defendant Bank of America ("Defendant" or the

"Bank"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*

(McKinney) (the "NYSHRL").  Specifically, Plaintiff has claimed that the Bank discriminated

against her and unlawfully terminated her employment on the basis of her national origin,

created a hostile work environment, and retaliated against her for her complaints to the Bank's

human resources department (known within the Bank as "Advice & Counsel").  Currently before

the Court is Defendant's motion for summary judgment dismissing all of Plaintiff's claims

against it.  (Dkt. 31.)[1]

      In response to Defendant's motion, Plaintiff indicated that she wished to withdraw both

her federal and state claims that she was discriminated against on the basis of her national origin,

_____

      [1] Maria Loccisano was also originally named a defendant in this case, but Plaintiff
stipulated to the dismissal of all of her claims against Loccisano before discovery began.  (*See*
Dkt. 17.)

and to proceed solely on claims that, in retaliation for having complained of discrimination, she was harassed in the workplace and her employment was eventually terminated.  (*See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated May 16, 2012 ("Pl. Opp. Mem.") (Dkt. 41), at 4, 12-14).  For the reasons discussed below, Plaintiff's claims of discriminatory termination (as well as any claims that Plaintiff may have been asserting for discriminatory hostile work environment) are dismissed without prejudice.  As to Plaintiff's remaining claims of retaliatory harassment and termination, summary judgment in Defendant's favor is granted.

## BACKGROUND

A.   **Factual Background**[2]

1.   **Plaintiff's Employment**

Plaintiff worked for the Bank as a Banking Center Manager ("BCM") from June 18, 2007, until her termination on November 2, 2011.  (Defendant Bank of America N.A.'s Concise Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, dated Apr. 5, 2013 ("Def. 56.1 Stmt.") (Dkt. 33), ¶ 1; Plaintiff's Rule 56.1 Counter Statements of Material Facts, dated May 17, 2013 ("Pl. 56.1 Stmt.") (Dkt. 40), ¶ 1.)  Plaintiff began her employment with the Bank at the Baldwin Harbor Banking Center.  (Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶ 2.)  Around June 2008, she transferred to the University Banking Center in Hempstead, New York.  (Def. 56.1 Stmt. ¶ 6; Pl. 56.1 Stmt. ¶ 6.)

---

[2] For the most part, the facts summarized herein are taken from the parties' respective statements pursuant to Local Civil Rule 56.1 (*see* discussion *infra*, at Discussion Part II(A)) and any unrefuted evidence submitted by the parties.  To the extent the parties dispute particular assertions of fact, the Court has attempted to ascertain whether the evidentiary record actually reveals any conflict.  In this regard, the Court notes that, even though Plaintiff purports to dispute certain facts set forth in Defendant's Rule 56.1 Statement, she often cites no evidentiary support for her contrary position.  Where the record reveals no conflict, the Court has taken the facts set out by Defendant as undisputed, despite Plaintiff's conclusory assertions that disputes exist.

As a BCM, Plaintiff was responsible for managing the overall operations of her banking center ("Banking Center" or "Center"), coaching associates, ensuring that sales goals were met, and developing relationships with internal and external clients and customers.  (Def. 56.1 Stmt. ¶ 3; Pl. 56.1 Stmt. ¶ 3.)  Additionally, Plaintiff was ultimately responsible for the internal audit scores that her Banking Center received.  (Def. 56.1 Stmt. ¶ 4; Pl. 56.1 Stmt. ¶ 4.)  Internal audits were conducted by an independent group within the Bank known as the Banking Center Control Review ("BCCR") team.  (*Id.*)  Throughout Plaintiff's employment with the Bank, regular operational inspections were also performed by the Bank's Consumer Market Managers ("CMMs").  (*Id.*)

When Plaintiff began her employment with the Bank in 2007, she reported to William Cherry ("Cherry"), a CMM.  (Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶ 2.)  Cherry, in turn, reported to the Consumer Market Executive ("CME").  (*Id.*)  In 2008 or 2009, Plaintiff began reporting to CMM Wyder Tutiven ("Tutiven") (Def. 56.1 Stmt. ¶ 7; Pl. 56.1 Stmt. ¶ 7), who reported to CME Anthony Volpicello ("Volpicello").  (*Id.*)  Around March of 2011, when Tutiven was replaced by CMM Maria Loccisano ("Loccisano"), Plaintiff began reporting to Loccisano (Def. 56.1 Stmt. ¶ 11; Pl. 56.1 Stmt. ¶ 11), who, like her predecessor, reported to Volpicello (*id.*).

### 2.   **Plaintiff's Early Performance Issues**

Once in 2008 and once in 2010, Plaintiff's Banking Center failed its routine audit.  (Def. 56.1 Stmt. ¶¶ 5, 8; Pl. 56.1 Stmt. ¶ 5.)  In 2008, Plaintiff's Center failed the audit with a 78.7% ("4" – "Unsatisfactory"),[3] and, as a result, Plaintiff's then-CMM, Cherry, issued Hahn a written warning for failure to meet performance expectations.  (Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Stmt. ¶ 5.)

---

[3] Based on the evidence in the record, it appears that a score of "5" or lower is considered a failing score on the routine or BCCR audit.  (*See* Def. 56.1 Stmt. ¶¶ 5, 8, 45.)

On June 23, 2010, Plaintiff's Center again failed its operational review audit, with a score of "5." (Def. 56.1 Stmt. ¶ 8; Pl. 56.1 Stmt. ¶ 8.)  In light of that failing audit score, Plaintiff's CMM at that time, Tutiven, issued Plaintiff a verbal warning on or about July 1, 2010.  (Def. 56.1 Stmt. ¶ 9.)

After the second failed audit, Tutiven expressed to Plaintiff that he was disappointed that operational-process inspections, which were supposed to be taking place, and which were part of Plaintiff's responsibilities as the branch manager, were not being performed.  (Def. 56.1 Stmt. ¶ 8 & Ex. C (Excerpts from deposition of Wyder Tutiven ("Tutiven Dep.")), at 39-44 & Ex. 2.) Pursuant to standard Bank procedure, Tutiven also called Advice & Counsel to notify that department that he had given Plaintiff a verbal warning.  (Def. 56.1 Stmt. ¶ 9.)

Shortly thereafter, in November 2010, Tutiven followed up on a complaint that an associate had made about Plaintiff to a CMM who was covering for Tutiven while he was out of the office.  (Def. 56.1 Stmt. ¶ 10; Pl. 56.1 Stmt. ¶ 10; Tutiven Dep., at 47-48 & Ex. 1.)  In connection with this, Tutiven coached Plaintiff on her communication style and approach with her associates.  (*See* Def. 56.1 Stmt. ¶ 10; Pl. 56.1 Stmt. ¶ 10; Tutiven Dep., at 50.)

### 3.   **Plaintiff's Interactions with Loccisano**

#### a.   **Initial Interactions**
####       **(May 2010)**

Prior to replacing Tutiven permanently in March 2011, Loccisano had served as a temporary CMM for a period of time in 2010.  (Def. 56.1 Stmt. ¶ 12; Pl. 56.1 Stmt. ¶ 12.) During that time, Plaintiff and Loccisano had a few interactions, which Plaintiff documented in an email to herself.  (Def. 56.1 Stmt. ¶ 13 & Ex. A (Excerpts from deposition of Lori Hahn, ("Hahn Dep.")), at Ex. 2; Pl. 56.1 Stmt. ¶ 13.)  In that email, Plaintiff wrote that, in two such interactions on May 19, 2010 and May 20, 2010, she had felt "very uncomfortable" around

4

Loccisano, that Loccisano had showed "no empathy" regarding a situation that an employee was dealing with at the time, and that Plaintiff had concerns about Loccisano's managerial approach. (Def. 56.1 Stmt. ¶ 13; Hahn Dep., at Ex. 2; Pl. 56.1 Stmt. ¶ 13.)  Plaintiff indicated that she thought Loccisano should "be more professional and try to build more of a connection with employees when coming in."  (Hahn Dep., at Ex. 2.)

> **b.  Loccisano's Alleged Remark Regarding Plaintiff's National Origin, and Plaintiff's Alleged Complaint (July and Early August, 2011)**

Plaintiff officially started reporting to Loccisano in March, 2011, and, in a meeting held on or about July 28, 2011, Loccisano delivered Plaintiff's annual performance review.  (Def. 56.1 Stmt. ¶ 59; Pl. 56.1 Stmt. ¶ 59.)  Plaintiff received a "satisfactory" rating on her written performance assessment, part of which was completed by her former-CMM Tutiven.  (*Id.*; Affidavit of Lori Hahn, sworn to May 14, 2013 ("Pl. Aff.") (Dkt. 42), ¶ 4.)  Plaintiff, however, contends that, toward the end of the meeting with Loccisano, as they were talking about a customer-satisfaction tool, Loccisano suddenly asked Plaintiff, "What nationality are you?" (Def. 56.1 Stmt. ¶ 59; Pl. 56.1 Stmt. ¶ 59; Pl. Aff. ¶ 4.)  Plaintiff told her that she was German, and Loccisano allegedly replied "[O]h, that's why you're so thick-headed."  (*Id.*)[4]

Although the Bank has no record of having received a complaint from Plaintiff at or near this time (*see infra*, at Background, Part A(3)(f)), and Loccisano states that she was unaware of any complaint by Plaintiff until after August 23, 2011 (*see infra*, at Background, Part A(3)(f)), Plaintiff contends that, sometime in early August, she lodged a complaint with Advice &

---

[4] Plaintiff concedes that she was not born in Germany, but rather was born in the United States, that she does not speak German or have a German accent, that she has never been to Germany, that her parents are not German, that her maternal grandparents are not German, and that she attributes her German national origin to one set of grandparents on her father's side. (Def. 56.1 Stmt. ¶¶ 66-71; Pl. 56.1 Stmt. ¶¶ 66-71.)

Counsel about Loccisano's comment (Pl. Aff. ¶ 4).  Plaintiff further maintains that, after she did so, Loccisano began harassing her on a daily basis, by "writing [her] up for unsubstantiated infractions; screaming at [her] on the telephone while [she] was with a customer; screaming at [her] in front of customers, or simply having [her] send [Loccisano] an email when [Plaintiff] arrived at work in the morning[,] when no other manager was required to do so."  (Pl. Aff. ¶ 5; *see also id.* ¶ 6 (Plaintiff stating that Loccisano subjected her to a "continual onslaught of abuse").)[5]  The circumstances of some of these purported instances of harassment are described below.

### c.  The ATM Incident at Plaintiff's Banking Center (August 12, 2011)

On August 12, 2011, there was an ATM cross-load error at Plaintiff's Center, resulting in the wrong denominations of bills being loaded into one of the Center's ATMs (the "ATM Incident").  (Def. 56.1 Stmt. ¶ 15; Pl. 56.1 Stmt. ¶ 15.)  At first, it appeared that $80,000 was missing from the ATM.  (*Id.*)  Upon further investigation, it was revealed that the ATM cassette containing $50 bills had been placed where the cassette containing $20 bills should have been placed (Def. 56.1 Stmt. ¶ 20), and that $90,000 had been improperly dispensed (Hahn Dep., at 86:7-15, 97:15-20).  Joni Hutchinson ("Hutchinson"), a full-time bank teller, and Maria Soares ("Soares"), the personal banker at the Center, had loaded the ATM earlier that week.  (Def. 56.1 Stmt. ¶ 16; Pl. 56.1 Stmt. ¶ 16.)  At her deposition, however, Plaintiff admitted that the ATM Incident was ultimately her responsibility.  (Def. 56.1 Stmt. ¶ 20.)

---

[5] Plaintiff does not contend that Loccisano made any further comments about Plaintiff's national origin; indeed, Plaintiff admits that, other than the one alleged comment described above, Loccisano never made any other similar or discriminatory remarks.  (Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.)  Plaintiff also concedes that she did not see Loccisano every day, but rather that Loccisano visited the Center approximately once a week for an hour or two, and did not yell at Plaintiff every time she came.  (Hahn Dep., at 194-97.)

Both Soares and Hutchinson were out of the country at the time the ATM Incident was discovered, which also raised significant concerns.  (Def. 56.1 Stmt. ¶ 16; Pl. 56.1 Stmt. ¶ 16.) After learning of the error, Plaintiff instructed another Bank employee to shut down the ATM and determine how the error had occurred, because Plaintiff was not trained on how to use that particular ATM.  (Def. 56.1 Stmt. ¶ 17; Pl. 56.1 Stmt. ¶ 17; Hahn Dep., at 78, 81, 83.)  Plaintiff then notified Loccisano about the ATM error, telling Loccisano that she did not yet know what had caused the error.  (Def. 56.1 Stmt. ¶ 18.)  Thereafter, Loccisano arrived at Plaintiff's Center, investigated the error, and performed a cash count.  (Def. 56.1 Stmt. ¶ 19; Pl. 56.1 Stmt. ¶ 19.)

The ATM Incident occurred the day before Plaintiff was scheduled to take a one-week vacation.  (Def. 56.1 Stmt. ¶ 21; Pl. 56.1 Stmt. ¶ 21.)  Three of the five associates in Plaintiff's Banking Center were on leave at that time, so Plaintiff's absence would have left only two associates at the Center.  (*Id.*)  Plaintiff contends that she had previously received permission to go on this vacation, but that the staffing in her Center had changed at the last minute.  (Hahn Dep., Ex. 3.)  Defendant states that, during Loccisano's visit to the Banking Center on the day of the ATM Incident, Loccisano expressed concerns about Plaintiff's management skills and about her decision to take vacation at the same time that three other associates would be absent.  (Def. 56.1 Stmt. ¶ 22; Pl. 56.1 Stmt. ¶ 22.)  Specifically, Defendant contends, and Plaintiff disputes, that Loccisano had concerns that Plaintiff provided her inconsistent information about the ATM Incident and that Plaintiff did not display a sense of urgency or concern regarding the Incident.  (Def. 56.1 Stmt. ¶ 23.)  In addition, Loccisano advised Plaintiff that she would send someone to visit and inspect the Banking Center because Loccisano felt that there were problems with the Center's operations and lack of organization.  (Def. 56.1 Stmt. ¶ 22; Pl. 56.1 Stmt. ¶ 22.)

### d.   Loccisano's Follow-Up Telephone Call With Plaintiff
### (August 13, 2011)

After the ATM Incident, Plaintiff did not immediately go on vacation, as previously planned (Def. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt. ¶ 24), and she and Loccisano spoke by telephone the following day (Def. 56.1 Stmt. ¶¶ 24-25; Pl. 56.1 Stmt. ¶¶ 24-25).  Despite slight differences in their accounts, the parties do not materially dispute what happened on that August 13 call.

According to Plaintiff, she called Loccisano to discuss whether Loccisano was sending a teller to help Plaintiff at the Center, and during the call, they began discussing the ATM Incident. (Pl. Aff. ¶¶ 7-8.)  It is undisputed that Loccisano criticized Plaintiff, on the call, for not requesting a floating teller to work at the Center, and also said that the Center's key and "combo" book used to access the vault were a "mess."  (Def. 56.1 Stmt. ¶ 25; Pl. 56.1 Stmt. ¶ 25; Pl. Aff. ¶ 8.)  Plaintiff states that she informed Loccisano, for the second time, that a teller's car had been stolen and the teller had not reported to work that day, leaving the Banking Center with only one associate.  (Pl. Aff. ¶ 8.)  Plaintiff also asserts that she denied Loccisano's accusations about the state of the key and combo book, and that Loccisano then began yelling at her.  (Def. 56.1 Stmt. ¶ 25; Pl. 56.1 Stmt. ¶ 25.)  In fact, Plaintiff contends that Loccisano began screaming so loudly that anyone could hear through the phone, which prompted Plaintiff to put the phone down so that a customer could not hear the screaming.  (Pl. Aff. ¶ 7.)  Plaintiff also asserts, though, that she told Loccisano that she had a customer at her desk and that she was embarrassed by the yelling, so she had to go.  (Pl. Aff. ¶ 7; Pl. 561 Stmt. ¶ 25.)  In any event, it appears undisputed that Plaintiff hung up the phone before getting any sort of acknowledgement from Loccisano. (*See* Def. 56.1 Stmt. ¶ 25; Hahn Dep., at 114-15 & Ex. 4 (Email dated 8/13/2011 to Plaintiff's personal email address from Plaintiff's work email address describing the phone call with

Loccisano and stating "I hung up on her"); Def. 56.1 Stmt. ¶ 33 (Plaintiff told Advice & Counsel

that she hung up on Loccisano); Pl. 56.1 Stmt. ¶ 33.)

Plaintiff further contends that, as a general matter, Loccisano "berate[d]" her for her lack

of diligence in connection with the ATM Incident, and that, following that incident, Loccisano

began to "scream" at her on a continual basis.  (Pl. Aff. ¶ 8.)[6]

### e.  Operational Inspection of Plaintiff's Banking Center
   ### (August 15, 2011)

Two days later, on August 15, 2011, Loccisano called Advice & Counsel to seek

guidance on the proper discipline for Plaintiff's behavior in (1) mishandling the ATM incident

and (2) being insubordinate for purportedly hanging up on Loccisano during their August 13

phone call.  (Def. 56.1 Stmt. ¶ 26; Pl. 56.1 Stmt. ¶ 26.)  According to Defendant, and Plaintiff

does not dispute this, Loccisano was unaware, as of the date of her call to Advice & Counsel,

that Plaintiff had made any complaint about her.  (*Id.*)  Advice & Counsel advised Loccisano to

arrange for an operational inspection of Plaintiff's Banking Center and to call back regarding the

results of this inspection, and also to discuss Plaintiff's insubordination.  (Def. 56.1 Stmt. ¶ 28;

Pl. 56.1 Stmt. ¶ 28.)

In accordance with this advice, Loccisano arranged for an inspection of Plaintiff's

Banking Center to take place the following week, while Plaintiff was away on vacation.  (Def.

56.1 Stmt. ¶ 29; Pl. 56.1 Stmt. ¶ 29.)  Plaintiff recalls that, when she returned from vacation,

sometime around August 22, 2011, Nadine Brenson, the BCM who had conducted the

investigation in her absence, went over with her a checklist of the issues she had found during

the investigation.  (*Id.*)

---

[6] Plaintiff also contends that Loccisano began to ridicule Plaintiff continuously for applying to work at a branch closer to Plaintiff's home, stating that "you just can't let go of the fact that you didn't get that branch."  (Pl. Aff. ¶ 9.)

On August 23, 2011, at approximately 4:11 p.m., Loccisano reported to Advice &
Counsel that the inspection had revealed operational concerns with the Center's key and combo
log and other inventory issues, and asked for guidance from Advice & Counsel as to what the
proper disciplinary action should be, in light of the disorganized state of the Center and
Plaintiff's insubordination in hanging up on Loccisano.  (Def. 56.1 Stmt. ¶ 30.)  Advice &
Counsel advised Loccisano to speak with Plaintiff about the operational issues, as well as about
Plaintiff's behavior on the August 13 telephone call.  (*Id.*)  On or about that same day, Loccisano
and Plaintiff spoke regarding the inspection results.  (Def. 56.1 Stmt. ¶ 31; Pl. 56.1 Stmt. ¶ 31.)
Loccisano also asked Plaintiff whether she should have returned Loccisano's call on August 13,
and Plaintiff responded, "[N]o."  (Def. 56.1 Stmt. ¶ 31; *see also* Loccisano Dep., at 116.)

### f.      Calls by Loccisano and Plaintiff to Advice & Counsel (August 23, 2011)

After her conversation with Plaintiff, Loccisano called Advice & Counsel at
approximately 6:15 p.m. on August 23, 2011, to report the results of that conversation.  (Def.
56.1 Stmt. ¶ 32.)  During the call, Advice & Counsel discussed with Loccisano her options,
including that she could issue Plaintiff a written warning for performance and a final written
warning for inappropriate behavior.  (*Id.*)  According to Defendant, Loccisano had still not
received any complaints by Plaintiff about her as of the time of this call, and Plaintiff does not
refute this.  (*See id.*; Pl. 56.1 Stmt. ¶ 32.)

At approximately 7:30 p.m. on August 23 (the same evening that Loccisano had
contacted Advice & Counsel), Plaintiff, herself, contacted Advice & Counsel, to complain about
Loccisano's treatment of her.  (Def. 56.1 Stmt. ¶ 33; Pl. 56.1 Stmt. ¶ 33.)  Plaintiff spoke with
Advice & Counsel HR Advisor Oliver Whitelaw ("Whitelaw") and described how Loccisano had
allegedly reacted to the ATM Incident by yelling at Plaintiff and questioning her about whether it

was a "good idea for [Plaintiff] to go on vacation."  (*Id.*)  Plaintiff then described how, on

August 13, she reported to work even though she was on vacation, and how Loccisano again

questioned her, over the phone, about her vacation plans.  (*Id.*)  Plaintiff claimed that Loccisano

was yelling so loudly during the August 13 telephone call that Plaintiff was forced to hang up the

telephone.  (*Id.*)  Plaintiff also told Whitelaw that, a few weeks prior to the ATM incident,

Loccisano had made a comment about Plaintiff's German heritage – *i.e.*, that her heritage would

explain why she was "so thick-headed."  (Def. 56.1 Stmt. ¶ 34; Pl. 56.1 Stmt. ¶ 34.)  According

to Defendant, this was Plaintiff's first complaint regarding that alleged comment.  (Def. 56.1

Stmt. ¶ 36.)

### g.   Discipline Resulting from the ATM Incident
### (August 31, 2011)

One week later, on August 31, 2011, Loccisano gave Plaintiff a written warning for

failure to meet performance expectations and a final written warning for inappropriate behavior

for Plaintiff's actions on August 12-13.  (Def. 56.1 Stmt. ¶ 38; Pl. 56.1 Stmt. ¶ 38.)  At the same

time, Loccisano counseled Plaintiff about her lack of leadership concerning the ATM Incident

and for taking vacation when she had previously approved a three-week vacation for her only

personal banker.  (*Id.*)  Loccisano also advised Plaintiff that the operational inspection conducted

while Plaintiff was on vacation revealed several compliance violations.  (*Id.*)  Plaintiff refused to

execute both written warnings.  (Def. 56.1 Stmt. ¶¶ 38, 40; Pl. 56.1 Stmt. ¶¶ 38, 40.)

On that same day, Plaintiff called Advice & Counsel again, to discuss the fact that she

had refused to execute the written warnings that had been given to her.  (Def. 56.1 Stmt. ¶ 41; *id.*

at Ex. F (Excerpts from deposition of Oliver Whitelaw ("Whitelaw Dep.")), at 15:22-16:7 &

Ex. 11, at BANK0421.)

At some point after the ATM Incident, Plaintiff herself issued final written warnings to Hutchinson and Soares, the two associates who were involved in loading the ATM.  (Def. 56.1 Stmt. ¶ 20; Hahn Dep., at 187-90.)  Even though Soares had not been given any written warnings prior to the ATM Incident, Plaintiff nonetheless gave her a final written warning because of Soares's direct involvement in loading the ATM, and the amount of money that was lost.  (Hahn Dep., at 189-90.)

### h.      Meeting To Address Plaintiff's Complaint About Loccisano's Alleged Derogatory Remark (September 7, 2011)

After Plaintiff spoke with him on August 23, Whitelaw contacted Loccisano's manager, Volpicello, and advised him of the derogatory comment allegedly made by Loccisano.  (Def. 56.1 Stmt. ¶ 42; Pl. 56.1 Stmt. ¶ 42.)  Until that time, Volpicello had been unaware of any complaints by Plaintiff about Loccisano, so he arranged to hold a meeting with Plaintiff and Loccisano on September 7, 2011, to discuss Plaintiff's concerns.  (*Id.*)  At that meeting, Loccisano apologized to Plaintiff for the alleged comment about Plaintiff's national origin, and Volpicello expressed concerns about the ATM Incident.  (Def. 56.1 Stmt. ¶ 43; Pl. 56.1 Stmt. ¶ 43.)  Thereafter, Plaintiff reported to Whitelaw that she was satisfied with what had occurred during the meeting with Volpicello and Loccisano.  (Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶ 44.)

### i.      Further Incidents of Alleged Harassment by Loccisano (September-October, 2011)

In her opposition to Defendant's motion, Plaintiff describes what she claims to be additional instances of harassment by Loccisano, in the months after August, 2011.[7]  Plaintiff contends that, on one occasion in September, 2011, Loccisano stated that Plaintiff was merely

---

[7] Generally speaking, Plaintiff testified, at her deposition, that Loccisano visited the branch once a week and did not yell at her every time that she was there.  (Hahn Dep., at 194-97.)

pretending to coach an associate, but was instead focusing on using the photocopy machine.  (Pl. Aff. ¶ 10.)  Plaintiff also states that Loccisano yelled at her in front of a customer at some point in September.  (*Id.* ¶ 11.)

Plaintiff further asserts that, at a branch manager meeting that Loccisano held in October, 2011, Loccisano asked Plaintiff "are you alright [sic] because it does not seem like you are paying attention," and that Plaintiff did not know why Loccisano would have asked her that question.  (*Id.* ¶ 12.)  Plaintiff contends that, during that same meeting, Loccisano asked her, "[C]an you stop texting and put your phone down?," when, according to Plaintiff, Plaintiff did not have her phone with her, and another manager said as much.  (*Id.* ¶ 12.)  Plaintiff states that there was no reason for Loccisano to embarrass Plaintiff in front of her colleagues or to accuse Plaintiff of something she was not doing.

### 4.   Final Events Leading to Plaintiff's Termination

#### a.   Audit of Plaintiff's Banking Center (October 13, 2011)

On October 13, 2011, Plaintiff's Banking Center again performed poorly on a routine BCCR audit, receiving a score of "6" or "Needs Improvement," which was just above a failing score.  (Def. 56.1 Stmt. ¶ 45.)  On October 18, 2011, Loccisano called Advice & Counsel to discuss the BCCR audit results along with other issues that she had noticed with Plaintiff's performance since the August 31, 2011 warnings.  (Def. 56.1 Stmt. ¶ 46.)  During that October 13 call, Advice & Counsel and Loccisano discussed moving forward with a final written warning for overall performance.  (*Id.*)  Consequently, on October 19, 2011, Plaintiff was given a final written warning for performance.  (Def. 56.1 Stmt. ¶ 47; Pl. 56.1 Stmt. ¶ 47.)  This final written warning also made note of Plaintiff's tardiness, including her late arrival on the day of the routine audit.  (*Id.*)  At her deposition, Plaintiff acknowledged that she had difficulty arriving at

the Banking Center on time, blaming this on traffic and the fact that she lived far away, and she further acknowledged that it was important, as a BCM, to arrive on time.  (Def. 56.1 Stmt. ¶ 48; Pl. 56.1 Stmt. ¶ 48.)  Plaintiff also admitted that her Center's audit scores were never strong. (Hahn Dep., at 32:8-20.)

**b.**  **Investigation of Associate Complaints about Plaintiff**
**(Late October, 2011)**

On October 24, 2011, Loccisano contacted Advice & Counsel to advise that, during an exit interview with one of Plaintiff's associates, the associate expressed that the associates in Plaintiff's Banking Center were "unhappy and looking for employment elsewhere."  (Def. 56.1 Stmt. ¶ 49 & Ex. E (Excerpts from deposition of Tamara Johnson ("Johnson Dep.")), at 19:19-21:5 & Ex. 11.)  Advice & Counsel recommended that Loccisano follow up by doing a "pulse check," or "climate review," of the Center, which would involve interviewing the remaining associates at the Center in order to assess whether they were being mistreated.  (Def. 56.1 Stmt. ¶¶ 50-51; Pl. 56.1 Stmt. ¶ 51.)

Loccisano informed Plaintiff that Loccisano would be conducting a climate review and asked Plaintiff to stay home from work, with pay, on October 28, 2011.  (*Id.*)  On October 28, Loccisano interviewed three of Plaintiff's associates –Soares, Charles Castillo ("Castillo"), and Gabriella Ruhlig ("Ruhlig").  (Def. 56.1 Stmt. ¶ 52.)  Among other complaints, all three associates told Loccisano that Plaintiff failed to follow Bank policy in various circumstances (Def. 56.1 Stmt., at Exs. G (Excerpts from deposition of Maria Soares ("Soares Dep.")), at 29:9-30:13, 41:20-41:25, 53:16-22; H (Excerpts from deposition of Charles Castillo ("Castillo Dep.")), at 34:3-25, 37:19-38:6; I (Excerpts from deposition of Gabriella Ruhlig ("Ruhlig Dep.")), at 27:21-29:16); Soares and Ruhlig said that Plaintiff spoke rudely to Center associates (Soares Dep., at 39:17-41:9; Ruhlig Dep., at 31:8-15); and Ruhlig further mentioned that

"everyone was unhappy to work [at Plaintiff's Banking Center]" and that "it wasn't really a nice place to work" (Ruhlig Dep., at 44:23-45:10).

On October 31, 2011, after the associate interviews, Loccisano contacted Advice & Counsel and spoke with Advisor Tamara Johnson ("Johnson") twice to discuss the associates' feedback and Loccisano's continued concerns about Plaintiff's leadership abilities and performance.  (Def. 56.1 Stmt. ¶ 53.)  Loccisano specifically consulted with Johnson on Loccisano's options for how to proceed and the possibility of terminating Plaintiff's employment.  (*Id.*)

**5.     Plaintiff's Termination on November 2, 2011**

On November 2, 2011, Plaintiff failed to report to a previously-scheduled training at her Banking Center.  (Def. 56.1 Stmt. ¶ 54.)  Plaintiff did not notify anyone at the Center as to the reason for her absence until mid-day, when she texted her Assistant BCM and said that a family emergency was requiring her to travel out of state.  (*Id.*; Johnson Dep., Ex. 11, at BANK0427.)  That same day, Loccisano spoke with Johnson at Advice & Counsel and Volpicello about Plaintiff's performance and her failure to report to work.  (Def. 56.1 Stmt. ¶¶ 54-55.)

During the November 2 call with Advice & Counsel, Loccisano and Johnson discussed the possibility of terminating Plaintiff employment with Defendant.  (Def. 56.1 Stmt. ¶ 55.)  After reviewing the previous Advice & Counsel notes and speaking with a Senior Advisor, Johnson recommended that Plaintiff be terminated.  (*Id.*)  Plaintiff was fired on November 2, 2011.  (Def. 56.1 Stmt. ¶ 56; Pl. 56.1 Stmt. ¶ 56; Hahn Dep., at 9:20-22.)

While Plaintiff claims that she was terminated in retaliation for having complained about Loccisano's alleged derogatory remark regarding Plaintiff's national origin, Defendant contends

that Plaintiff was terminated based on her continued performance deficiencies and her lack of

leadership, as further evidenced by the climate review.  (Def. 56.1 Stmt. ¶ 56.)

> **B.**     **Procedural History**

>> **1.**     **Plaintiff's Complaint and the Voluntary
>> Dismissal of Her Claim Against Loccisano**

Plaintiff commenced her action in this Court on May 24, 2012, asserting claims against

both the Bank and Loccisano.  (*See* Complaint, dated May 14, 2012 ("Compl.") (Dkt. 1).)  On

July 17, 2012, all parties consented to proceed before a magistrate judge for all purposes.  (*See*

Dkts. 10, 11.)  On July 20, 2012, the Bank filed an Answer (*see* Answer to Complaint, dated

July 20, 2012 ("Answer") (Dkt. 14)), and, on July 24, 2012, Plaintiff voluntarily dismissed her

claims against Loccisano (*see* Notice of Dismissal of Defendant Maria Loccisano, dated July 24,

2012 (Dkt. 17)).  Plaintiff and the Bank then proceeded with discovery, which is now complete.

>> **2.**     **The Bank's Summary Judgment Motion and Plaintiff's
>> Withdrawal of Her National-Origin Discrimination Claims**

On April 5, 2013, the Bank moved for summary judgment on all of Plaintiff's claims

against it.  (*See* Defendant's Notice of Motion for Summary Judgment, dated Apr. 5, 2013

(Dkt. 31).)

In its moving papers, Defendant argued that, based on the record, Plaintiff could not

establish a *prima facie* case of discrimination, a hostile work environment based on

discrimination, or retaliation.  (*See generally* Memorandum of Law in Support of Defendant's

Motion for Summary Judgment, dated Apr. 5, 2013 ("Def. Mem.") (Dkt. 32).)  As to Plaintiff's

federal and state claims of discriminatory termination, Defendant argued that Plaintiff could not

establish a *prima facie* case of discrimination based on her national origin because she could not

show that she was a member of a protected class, that her performance was satisfactory, and that

her termination was not based on performance issues, but instead was related to a single, stray comment about Plaintiff's purported German heritage. (*Id.* at 4-10.) As to her hostile work environment claims, Defendant argued that Plaintiff could not establish that the alleged discriminatory conduct was sufficiently severe or pervasive to alter the terms of her employment, or that any allegedly harassing conduct was related to her national origin. (*Id.* at 10-14.) Finally, as to her retaliation claims, Defendant argued that Plaintiff could not establish a causal connection between her complaint about Loccisano's alleged remark and the claimed retaliatory conduct, and that, in any event, Plaintiff could not demonstrate that Defendant's legitimate business reasons for firing her were a pretext for retaliation. (*Id.* at 14-19.)

In her opposition brief, Plaintiff voluntarily withdrew her federal and state claims challenging her termination as based on national-origin discrimination. (*See* Pl. Opp. Mem., at 4.) Plaintiff argued, however, that the Court should deny summary judgment to Defendant on her claims of retaliatory termination, and her claims that she had been subjected to a hostile work environment. (*See generally id.*) With respect to retaliation, Plaintiff argued that the temporal proximity between her complaint about Loccisano's derogatory comment and the adverse employment action, coupled with Loccisano's harassing behavior during the relevant period, was sufficient to create a triable issue as to whether her termination was retaliatory. (*Id.* at 4-12.) Plaintiff further argued that her positive performance evaluations, given to her prior to her alleged first complaint regarding Loccisano's derogatory comment, were sufficient to support her position that Defendant's stated reason for her termination was a pretext for unlawful retaliation. (*Id.* at 11-12.) With respect to her hostile work environment claims, Plaintiff argued that those claims were not intended to be based on pervasive national-origin discrimination in the workplace, but rather on harassment that she allegedly suffered in retaliation for having

exercised her rights under Title VII and the NYSHRA.  (*See id*. at 12-14.)  In this regard, Plaintiff argued that the record contained evidence of sufficiently severe conduct to enable her claims to withstand Defendant's motion.  (*See id.* at 12-14.)

On reply, Defendant argued that Plaintiff's withdrawal of her discrimination claims begged the question of whether she had a good faith belief that Loccisano's single alleged remark constituted unlawful discrimination, and, therefore, whether Plaintiff's complaint about that remark constituted protected activity under Title VII or the NYSHRA.  (*See* Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment, dated May 31, 2013 ("Def. Reply") (Dkt. 44), at 2-3.)  Defendant also argued that the record could not support Plaintiff's contention that retaliation was the "but-for" cause of her termination, both because too much time passed between her purported complaint of discrimination and her termination, and because it was undisputed that Loccisano did not know about Plaintiff's complaint until after she had already contemplated and initiated disciplinary action against Plaintiff.  (*See id.* at 3-4.)  Finally, Defendant argued that Plaintiff's vague allegations of harassment were insufficient to support any retaliation-based, hostile work environment claims because, among other reasons, none of the alleged incidents of harassment, individually or collectively, would "constitute conduct that a reasonable person would find hostile or abusive."  (*Id.* at 8-9.)

## DISCUSSION

## I.  PLAINTIFF'S WITHDRAWAL OF HER NATIONAL-ORIGIN DISCRIMINATION CLAIMS

Where a plaintiff voluntarily withdraws a claim after a defendant has filed a motion for summary judgment, but the parties have not agreed to a stipulation of dismissal, it is within the discretion of the Court to order the dismissal of the claim under "such terms and conditions as the court deems proper."  Fed. R. Civ. P. 41(a)(2).  Even where a withdrawn claim appears to be

meritless, dismissal without prejudice is usually the preferred course, as "the presumption in this circuit is that a court should grant [such] a dismissal pursuant to Rule 41(a)(2) absent a showing that defendants will suffer substantial prejudice as a result." *The Gap, Inc. v. Stone International Trading, Inc.*, 169 F.R.D. 584, 588 (S.D.N.Y. 1997).  Factors relevant to the ultimate determination of whether a voluntary dismissal should be with or without prejudice include: "plaintiff's diligence in bringing the motion; any 'undue vexatiousness' on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss." *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990).

In this case, in response to Defendant's summary judgment motion, Plaintiff has dropped both her federal and state-law claims that were founded directly on allegations of national-origin discrimination.  In particular, she has voluntarily withdrawn her discriminatory termination claims, and she has also apparently withdrawn her hostile-work-environment claims, to the extent those claims rested on allegations that she had been subjected to a discriminatory (as opposed to a retaliatory) hostile work environment at the Bank.  It may be possible to read Plaintiff's decision to withdraw these claims as an implicit concession that any such claims could not survive Defendant's motion, and, based on the arguments made by Defendant in its motion, it may be true that the withdrawn claims are defective.  Nonetheless, although neither party has presented any argument as to whether Plaintiff's discrimination claims should be dismissed with or without prejudice, the five-factor analysis set out in *Zagano* counsels in favor of dismissing the withdrawn claims without prejudice.

First, as soon as Defendant, by way of its motion, explained its position that Plaintiff's national-origin discrimination claims were not viable (*see* Def. Mem., at 4-10), Plaintiff, by way

of her opposition brief, informed the Court that these claims should be considered withdrawn (*see* Pl. Opp. Mem., at 4).  Second, even if, as Defendant contends, the claims are meritless, the Court has no basis to conclude that Plaintiff exhibited undue vexatiousness by asserting them.  As noted above, dismissal with prejudice is not generally warranted merely because a claim appears to lack merit; rather, courts in this circuit have repeatedly dismissed seemingly meritless claims without prejudice, where the defendant's arguments could be adequately addressed upon any re-filing of the action.  *See, e.g.*, *Harlem Teams for Self-Help, Inc. v. Abyssinian Baptist Church*, 189 F.R.D. 284, 286 (S.D.N.Y. 1999) ("To the extent that [p]laintiff's case proves to be as frivolous as [d]efendants claim, [d]efendants will be able readily to re-group and re-assert their argument, if, and when the action were to be brought again in the future." (internal quotation marks and citation omitted)).  Third, although this case has progressed to the point where discovery is complete, Defendant does not suggest that it has expended a large amount of time, effort, or expense in needless discovery, and the Court has not yet set a trial date or a deadline for pretrial submissions.  Fourth, given the relatively modest scope of the discovery record, it does not appear that Defendant would experience substantial duplication of expense if the case were to be re-filed in the future.  Finally, although Plaintiff offers no clear explanation for her withdrawal of her discrimination claims, the Court accepts that her decision to withdraw them was a reasonable response to well-supported positions asserted in Defendant's moving papers.

As each of the relevant factors favor the dismissal, without prejudice, of Plaintiff's voluntarily-withdrawn discrimination claims, the Court concludes that this would be the appropriate result.  Accordingly, Plaintiff's national-origin discrimination claims – including both her discriminatory termination claims and any claims she may have pleaded founded on

discriminatory hostility allegedly permeating her work environment – are hereby dismissed without prejudice.

## II.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLANTIFF'S REMAINING CLAIMS

Defendant has moved for summary judgment on Plaintiff's remaining federal and state claims that she was harassed, disciplined, and eventually terminated, in retaliation for having complained of national-origin discrimination.  For the reasons discussed below, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' retaliation claims.

### A.   Applicable Legal Standards

#### 1.   Summary Judgment under Rule 56

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted when the parties' sworn submissions show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Accordingly, the Court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Nonetheless, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading," but "must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  This means that "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), but, rather, must present "significant probative evidence tending to support the complaint."  *Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

In sum, the Court "cannot try issues of fact; it can only determine whether there are issues to be tried" on the evidence presented.  *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967); *accord. Sutera v. Schering Corp.*, 73 F.3d 13, 15-16 (2d Cir. 1995).  Where there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party, summary judgment is appropriate.  *See Liberty Lobby*, 477 U.S. at 248.

Under this Court's local rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).[8]  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment

---

[8] If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see also* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Thus, the

Court may not rely solely on the statement of undisputed facts contained in the moving party's

Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by

the record.  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244

(2d Cir. 2004); *see also Holtz*, 258 F.3d at 74; *Zerafa v. Montefiore Hosp. Hous. Co.*, 403

F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).  Summary judgment may only be granted where the

Court is satisfied that the undisputed facts, as supported by the record, "'show that the [movant]

is entitled to a judgment as a matter of law.'"  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.

1996) (quoting Fed. R. Civ. P. 56(c)).

## 2.  Retaliation Claims Under Title VII and the NYSHRL

Under both Title VII and the NYSHRL, an employer may not discriminate against any

employee "because he [or she] has opposed any practice made an unlawful employment practice

by this subchapter, or because he [or she] has made a charge . . . under this subchapter."

42 U.S.C. § 2000e-3; *see also* N.Y. Exec. Law § 296(1)(e) ("It shall be an unlawful

discriminatory practice: . . . [f]or any employer . . . to discharge, expel or otherwise discriminate

against any person . . . because he or she has filed a complaint . . . under this article.").

An employment retaliation claim brought under Title VII is governed by the three-step

burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973).  *See Del Pozo v. Bellevue Hosp. Center*, No. 09 Civ. 4729 (SAS) (DF), 2011 WL

797464, at *5 (S.D.N.Y. Mar. 3, 2011) (applying the burden-shifting framework to a claim for

retaliation under Title VII).  Retaliation claims under the NYSHRL are analyzed under the same

standards as Title VII claims.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000)

("Our consideration of claims brought under the state . . . human rights laws parallels the

analysis used in Title VII claims [and § 1981 claims]") *superseded on other grounds by* N.Y.C.

Local Law No. 85.  Accordingly, both Plaintiff's federal and state retaliation claims follow the

familiar burden-shifting framework set out in *McDonnell Douglas* and *Texas Department of*

*Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Under *McDonnell Douglas* and *Burdine*, the plaintiff must first establish a *prima facie*

case of retaliation.  To establish a *prima facie* case of retaliation under Title VII, "an employee

must show that (1) she was engaged in protected activity; (2) the employer was aware of that

activity; (3) the employee suffered a materially adverse action; and (4) there was a causal

connection between the protected activity and that adverse action."  *Lore v. City of Syracuse*,

670 F.3d 127, 156-57 (2d Cir. 2012) (citations omitted).

The "adverse action" element of a retaliation claim is broader than the "adverse

employment action" element of Title VII discrimination claims.  *See Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  In the context of a retaliation claim, Title VII prohibits

"an employer from taking 'materially adverse' action against an employee because the employee

opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity."

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting

*Burlington*, 548 U.S. at 63).  As the Supreme Court explained in *Burlington*:

> The antiretaliation provision protects an individual not from all
> retaliation, but from retaliation that produces an injury or
> harm . . . .  In our view, a plaintiff must show that a reasonable
> employee would have found the challenged action materially
> adverse, which in this context means it well might have dissuaded
> a reasonable worker from making or supporting a charge of
> discrimination.

*Burlington*, 548 U.S. at 67-68.

Nevertheless, "Title VII does not set forth 'a general civility code for the American workplace,'" and "actions that are 'trivial harms' – *i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience' – are not materially adverse." *Tepperwien*, 663 F.3d at 567 (quoting *Burlington*, 548 U.S. at 68).  Material adversity must be "determined objectively, based on the reactions of a reasonable employee," and viewed in context, as "some actions may take on more or less significance depending on the context."  *Id.* In addition, "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Id.*

The burden of proof that a plaintiff must meet to survive a motion for summary judgment at the *prima facie* stage is "*de minimis*."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

If the plaintiff makes this *de minimis* showing, then a presumption of retaliation is created, and the burden then shifts to the employer merely to articulate some legitimate, non-discriminatory reason for the adverse action taken against the plaintiff.  *See id.*  The employer need not persuade the Court that the proffered reason was the actual reason for the adverse action; rather, the employer's burden is simply to rebut the plaintiff's *prima facie* case by clearly setting forth, "through the introduction of admissible evidence, the reasons for the [adverse action against the plaintiff]."  *Burdine*, 450 U.S. at 254-55.

If the employer articulates such a reason, then the presumption of retaliation disappears, *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993), and the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for retaliation, *see Burdine*, 450 U.S. at 253, meaning that the plaintiff would not have been subjected to the adverse action, but for his or her protected activity, *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532-33 (2013).[9]  As the Second Circuit has recently explained, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions."  *Kwan v. The Andalex Group LLC*, 737 F.3d 834, 846 (2d. Cir. 2013).  Once an employer has articulated a legitimate, non-retaliatory reason for its action, however, "temporal proximity alone" will be insufficient to defeat summary judgment.  *Id.* at 847.  The ultimate burden of proving that the defendant was intentionally retaliatory in its employment practices remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253.

The Court notes that an extra measure of caution is needed in awarding summary judgment to a defendant where, as in a retaliation case (or, more commonly, a discrimination case), intent is at issue.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  An employer's records will rarely document the state of mind or motives of its decision-makers, and therefore materials "must be carefully scrutinized" for circumstantial evidence about

---

[9] Shortly after this motion was fully briefed, the Supreme Court held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Nassar*, 133 S. Ct. at 2534; *see also Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, 545 F. App'x 23, 25 (2d Cir. 2013) (noting the heightened standard for Title VII claims, as well as noting that NYSHRL retaliation claims are still analyzed under the same standard).

the employer's state of mind and those factors that motivated the challenged action.

*Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996).  Nonetheless,

"summary judgment remains available for the dismissal of discrimination [and retaliation] claims

in cases lacking genuine issues of material fact."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 135

(2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)

("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive

context of discrimination cases."); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he

salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials –

apply no less to discrimination cases than to commercial or other areas of litigation.").

### B.     Plaintiff's Retaliation Claims

Plaintiff's remaining claims are that, in violation of both Title VII and the NYSHRL, she

was harassed by Loccisano, given disciplinary warnings, and fired from her position – all in

retaliation for having complained to management about Loccisano's allegedly discriminatory

comment about her German heritage.  Defendant principally argues that it is entitled to summary

judgment on these claims because, given the undisputed evidence regarding her poor job

performance, Plaintiff cannot show that the warnings were pretextual or that she would not have

been terminated, "but for" her complaint about Loccisano's remark.  Defendant also argues that

Plaintiff's allegations of harassment are insufficient to establish a hostile work environment, or a

material adverse action, as a matter of law.

#### 1.     Retaliatory Termination

Plaintiff's core complaint is that she was wrongfully fired because of her complaint about

Loccisano's derogatory remark.  Plaintiff's federal and state retaliatory termination claims falter

on the fourth element of Plaintiff's *prima facie* case (*i.e*., on her ability to show a "causal

connection" between the claimed protected activity and her termination).  In any event, even if Plaintiff could establish a *prima facie* case of retaliatory termination, Defendant would still be entitled to summary judgment because, in the face of its proffered legitimate, non-retaliatory reasons for discharging Plaintiff, Plaintiff cannot show that she would not have been terminated, but for Defendant's alleged retaliatory motive.

### a.      Plaintiff's *Prima Facie* Case

### i.      Protected Activity

A plaintiff's internal complaint to management about alleged discrimination will constitute a "protected activity," provided that she had a "good faith, reasonable belief that the conduct of her employer about which she complained violated Title VII."  *Pinner v. Budget Mortg. Bankers Ltd.*, 169 F. App'x 599, 600 (2d Cir. 2006); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).  In this case, there is undisputed evidence in the record that Plaintiff complained about Loccisano's alleged derogatory remark, at least once, to the Bank's "Advice & Counsel" department.  Although there may be a factual dispute as to whether Plaintiff actually had a "good faith, reasonable belief" that Loccisano's single, alleged comment about Plaintiff's national origin constituted unlawful discrimination, Defendant raised no challenge on this point until its reply brief (*see* Def. Reply, at 2-3), and the Court will not consider arguments raised for the first time on reply, *see Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999).

Moreover, although Plaintiff's withdrawal of her national-origin discrimination claims might suggest a belief that she would have difficulty establishing that Loccisano's alleged remark evinced an actual discriminatory animus, the Court will not read Plaintiff's withdrawal of her discrimination claims as an implicit concession that she could not prevail on those claims.  In

any event, Plaintiff need not establish the underlying Title VII or state-law violation. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Rather, all she must show to satisfy the first element of her *prima facie* case is her good faith, reasonable belief that Loccisano's remark – about which she complained – constituted unlawful, national-origin discrimination. The Court finds that, on this point, Plaintiff has set forth enough evidence to meet her *de minimus* burden.

### ii.   <u>Defendant's Knowledge</u>

Plaintiff has also presented enough evidence to satisfy the second element of a *prima facie* case of retaliation – that Defendant knew of her protected activity. While the parties dispute the timing of Plaintiff's first complaint to Advice & Counsel about Loccisano's purported remark, Defendant concedes that it knew of Plaintiff's complaint by at least August 23, 2011, which was prior to Plaintiff's November 2011 termination. Thus, the knowledge element of Plaintiff's *prima facie* case is also satisfied. (*Id.*)[10]

### iii.   <u>Material Adverse Action</u>

As to the third element of her *prima facie* case, there is no question that a job termination will be considered a materially adverse action, capable of supporting a retaliatory discharge claim, *see Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (citing *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)), and, indeed, the parties do not dispute this.

---

[10] As discussed further below, the evidence in the record regarding the timing of Plaintiff's complaint – and, perhaps more critically, when *Loccisano* (whose conduct is at issue with respect to any harassment claim) first learned of that complaint – becomes more problematic for Plaintiff at a later stage in the analysis, when she attempts to argue that the harassing conduct she allegedly endured or the disciplinary warnings she received were causally linked to that complaint. (*See infra*, at Part II(B)(iv) & (C).)

**iv.**     **Causal Connection**

Plaintiff, however, has not satisfied her burden on the fourth element of her *prima facie*

case, as she has not shown, and the Court's examination of the record has not revealed, evidence

from which a rational jury could find a causal connection between Plaintiff's internal complaint

about Loccisano and Plaintiff's termination.  A causal connection can be proven either

"(1) indirectly, by showing that the protected activity was followed closely by discriminatory [or

retaliatory] treatment, or through other circumstantial evidence such as disparate treatment of

fellow employees who engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by defendant."  *Gordon v. N.Y.C. Bd. of Educ.*,

232 F.3d 111, 117 (2d Cir. 2000).

 With respect to direct evidence, a plaintiff may establish the necessary connection

between the protected activity and the later material adverse action by pointing to documents or

statements "that reflect or suggest" such a causal relationship.  *See Wesley-Dickson v. Warwick*

*Valley Cent. Sch. Dist.*, No. 10 Civ. 2428 (JGK), 2013 WL 5338516, at *18 (S.D.N.Y. Sept. 24,

2013).  In this case, Plaintiff has not pointed to any direct evidence that Defendant was motivated

by retaliatory animus in terminating her employment.

With respect to *indirect* evidence of a causal connection, Plaintiff argues that her

complaint about Loccisano's derogatory remark, on the one hand, and her termination, on the

other, were sufficiently close in time to demonstrate the requisite causal link.  (Pl. Mem., at

8-10.)  Plaintiff also argues that the temporal proximity of her complaint to the disciplinary

warnings she received, and to Loccisano's alleged acts of harassment, constitute further indirect

evidence of a causal connection between her protected activity and her termination.  (*Id.*)

Although these arguments regarding "temporal proximity" warrant careful consideration, they ultimately fail.

Temporal proximity may, in some cases, be sufficient for a plaintiff to make out a *prima facie* case on the "causal connection" element of a retaliation claim, *see, e.g.*, *Mugavero v. Arms Acres, Inc.*, No. 03 Civ. 05724 (PGG), 2009 WL 890063, at *11 (S.D.N.Y. Mar. 31, 2009) (citing *Feingold v. City of New York*, 366 F.3d 138, 157 (2d Cir. 2004)), and the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001). Nonetheless, courts have uniformly held that, to establish a *prima facie* case of retaliation, the temporal proximity between the protected activity and the adverse action "must be 'very close.'" *Campbell v. Home Depot U.S.A., Inc.*, No. 03 Civ. 1421 (KMK) (HBP), 2006 WL 839001, at *13 (S.D.N.Y. Mar. 30, 2006) (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (internal quotation marks and citation omitted); *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383-84 (2d Cir. 2003) ("It makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to do so soon after the event."). In the Second Circuit, district courts "have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases).[11]

---

[11] *See also Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (no causal connection where three months passed between EEOC complaint and alleged adverse employment action); *Lewis v. Snow*, No. 01 Civ. 7785 (CBM), 2003 WL 22077457, at *8 (S.D.N.Y. Sept. 8, 2003) ("Plaintiff fails to make a showing of protected activity which was 'followed closely by' the alleged retaliatory treatment" where there was a more than three-month

Here, according to Plaintiff's own version of the facts, she complained in "early August 2011" about Loccisano's derogatory remark regarding Plaintiff's German national origin (Pl. Aff. ¶ 4), but Plaintiff was not terminated until November 2, 2011, approximately 11 weeks after she claims to have made the complaint (*id.* ¶ 5).  Without more, this period of time between Plaintiff's protected activity and her termination is too long to constitute evidence capable of sustaining Plaintiff's burden to establish a causal connection to support her retaliatory termination claim.  *See Garrett v. Garden City Hotel, Inc.*, No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (finding that the passage of two-and-a-half months between protected activity and adverse action was insufficient to establish a causal connection).

Plaintiff also cannot satisfy her burden on the "causal connection" element of her *prima facie* case by relying on Loccisano's allegedly harassing conduct toward Plaintiff during the time between the date when Plaintiff claims to have complained to Advice & Counsel and the date of her termination.  Plaintiff concedes that, even in May 2010, over a year before the date of her alleged complaint, she had concerns about Loccisano's conduct toward her – conduct that Plaintiff thought was sufficiently unprofessional to document in a June 2010 email to herself. (*See supra*, at Background, Part(A)(1)(a).)  In that email, Plaintiff described herself as having felt "very uncomfortable" around Loccisano and documented a number of examples of Loccisano's inappropriate "approach" toward employees in the workplace.  (*See id.*; Hahn Dep., Ex. 2.) These examples included Loccisano's seeming lack of empathy for an associate who had a

---

gap between them.); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 315-16 (S.D.N.Y. 2003) ("The four-month interval between the Plaintiff's [protected activity] in April 1999 and his termination in July 1999 is insufficient evidence of a causal connection . . . .  In fact, courts have repeatedly held that a four-month interval does not establish a causal connection for the purposes of a retaliation claim."); *but see Ashok v. Barnhart*, 289 F. Supp. 2d 305, 315 (E.D.N.Y. 2003) ("A period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related.").

family emergency, and Loccisano's questioning Plaintiff as to why Plaintiff was speaking so loudly, even after Plaintiff had said that she was having trouble hearing.  (*See id*.)  Overall, the types of conduct attributed by Plaintiff to Loccisano in 2010 are very similar to the types of conduct that Plaintiff describes as having occurred in the August to October 2011 timeframe, and that she now points to as evidence of Loccisano's retaliatory animus.  (*See, e.g*., Pl. Aff. ¶ 8 (highlighting Loccisano's 2011 criticism of Plaintiff's staffing decisions, even when associates were unavailable for unexpected and personal reasons); *id.* ¶¶ 9-10, 12 (describing comments by Loccisano in 2011 that Plaintiff found surprising, strange, or insulting).)  Where an employer's actions before and after an employee's protected activity are consistent, the post-complaint conduct cannot be considered retaliatory.  *Wright v. N.Y.C. Off-Track Betting Corp.*, No. 05 Civ. 9790 (WHP), 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008).

Moreover, there is no evidence in the record to contradict Loccisano's statement that, even if Plaintiff made a complaint in "early August 2011" about Loccisano's allegedly derogatory remark, Loccisano, herself, did not learn of any such complaint by Plaintiff until sometime after August 23, 2011.  (*See* Def. 56.1 Stmt. ¶ 32; Pl. 56.1 Stmt. ¶ 32.)  By that time, some of the conduct that Plaintiff claims should be viewed as giving rise to an inference of retaliation had already taken place, as that conduct was closely linked in time to the ATM Incident, which occurred on August 12, 2011.  (*See* Pl. Aff. ¶¶ 6-9 (describing Loccisano's "harassing" behavior to include berating and screaming at Plaintiff on August 12, 2011, and, in a follow-up phone call the next day, criticizing Plaintiff over a staffing issue).)

Finally, as Defendant argues, any possible inference of causation is defeated "if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge."  *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y.

2005) (finding that substantial intervening event occurred where, among other things, nurse-plaintiff breached patient confidentiality and refused to cooperate with an investigation); *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) ("Evidence of significant misconduct by a plaintiff that fully justifies the adverse employment action and that occurs after the employee's protected activity extinguishes the probative force that might arise from [temporal proximity]." (citing *Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998))).  Here, if, as Plaintiff claims, she made an internal complaint in "early August 2011" about Loccisano's purported discriminatory conduct, then there were numerous intervening causal events that occurred between that date and the date of her termination – including the ATM Incident, a poor routine audit of her Banking Center, and reports of complaints by Plaintiff's associates.  Any of these events would have been sufficient to justify Plaintiff's termination and hence to break any chain of causation from Plaintiff's protected activity.[12]

In any event, even if the timing of Loccisano's supposedly harassing conduct, or of Plaintiff's disciplinary warnings, could be sufficient to satisfy Plaintiff's *prima facie* burden of showing a retaliatory motive for Plaintiff's termination, her retaliation claims would still fail for the reasons discussed below.

---

[12] On a related point, the Court notes that it is undisputed that, on September 7, 2011 – nearly a month before Plaintiff was terminated – Plaintiff met with Loccisano and Volpicello to discuss Plaintiff's complaint about Loccisano's derogatory comment, that Loccisano apologized for that comment, and that Plaintiff reported to Advice & Counsel that she was satisfied with what had transpired at the meeting.  (Def. 56.1 Stmt. ¶¶ 42-44; Pl. 56.1 Stmt. ¶¶ 42-44.)  This seeming resolution of the issue, well before Plaintiff's termination, makes it even more difficult to see how a rational jury could possibly find a causal connection between Plaintiff's protected activity and her termination.

b. **Legitimate, Non-Retaliatory**
**Reasons for Plaintiff's Termination**

Even assuming that the evidence cited by Plaintiff is sufficient to establish a *prima facie* case of retaliatory termination, Defendant has satisfied its burden to articulate a legitimate, non-retaliatory reason for its action – *i.e.*, that Plaintiff was terminated for her repeated failures to meet performance expectations and for her lack of leadership.

It is undisputed that the Banking Center managed by Plaintiff received failing scores on independent audits in both 2008 and 2010. (*See supra*, at Background, Part A(2).) It is also undisputed that Plaintiff, as the manager of that Center, was responsible for the ATM Incident, in which the Bank lost a substantial amount of money. (*See supra*, at Background, Part A(3)(c).) It is also undisputed that, shortly after the ATM Incident, Plaintiff, in some manner, ended a telephone call with her supervisor (either by putting the phone down or hanging up) and did not call her back. (*See supra*, at Background, Part A(4)(a).) It is also undisputed that, two months after the ATM Incident, Plaintiff's Banking Center performed poorly on a third routine audit, and that Plaintiff failed to arrive in time for that audit. (*See id.*) Finally, it is undisputed that, during a climate review of Plaintiff's Banking Center, one or more of Plaintiff's four associates reported that Plaintiff had failed to follow Bank policy in various circumstances, that she had spoken rudely to the Banking Center associates, and that the associates were unhappy working at Plaintiff's Banking Center. (*See supra*, at Background, Part A(4)(b).) Defendant has introduced evidence that Plaintiff's disciplinary warnings were all specifically directed to these events, and that it was only after all of these events and progressive warnings, and after Plaintiff failed to report to work on November 2, 2011, that the Bank's Advice & Counsel unit recommended that her employment be terminated. (*See supra*, at Background, Part A(5).)

This evidence is sufficient to satisfy Defendant's burden to present legitimate, nondiscriminatory reasons for Plaintiff's termination, thereby requiring Plaintiff to come forward with evidence capable of showing that Defendant's non-retaliatory reasons were a mere pretext for retaliation.

### c.   <u>Pretext</u>

Plaintiff bears the ultimate burden of showing that her termination "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.[13]  On the overall record in this case, Plaintiff cannot satisfy that burden.

At bottom, Plaintiff's only evidence in support of her contention that Defendant retaliated against her when it discharged her from employment is (a) the supposed temporal proximity between her complaint about Loccisano's remark and Plaintiff's termination, and (b) the supposed "pattern of antagonism" by Loccisano during that time frame.  As noted above, however, Plaintiff has not actually shown a close temporal connection between her alleged protected activity and her termination (*see supra*, at Discussion, Part II(B)(1)(a)(iv)), and, even if she had, this would not be enough to enable her termination claims to survive summary judgment, in light of the fact that Defendant has articulated a legitimate, non-retaliatory reason for its action, *see Kwan*, 737 F.3d at 847.  Further, neither Plaintiff's disciplinary warnings, nor the purportedly harassing conduct by Loccisano raises an inference of retaliation sufficient to suggest that Defendant's proffered reasons for Plaintiff's termination were pretextual, or that

---

[13] This Court need not address Plaintiff's arguments that she need only be able to show that retaliation was a "motivating factor" for the employer's actions.  (*See* Pl. Mem., at 11.)  In *Nassar*, the Supreme Court explained that, in order to prevail on a Title VII retaliation claim, a plaintiff must be able to prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. In light of *Nassar,* the "mixed-motive" argument available under § 2000e-(2) of Title VII (the provision prohibiting status-based discrimination) is no longer available in a retaliation context. *Id.*

there is a genuine triable issue of fact as to whether a retaliatory motive was the "but-for" cause of her termination.

Most importantly, Plaintiff has not come forward with any evidence capable of showing that her job performance did not actually warrant the criticisms she received, in the form of written and verbal warnings.  In fact, the evidence is undisputed to the contrary.  For example, the record reflects that Plaintiff, herself, issued warnings to employees who were involved in the ATM Incident, and that Plaintiff acknowledged that she had ultimate responsibility for that serious incident.  (*See supra*, at Background, Part A(3)(c).)  The record also shows that Plaintiff conceded that she terminated her call with her superior, Loccisano, after the ATM Incident, and she has certainly offered no evidence that she tried to call Loccisano back.  (*See supra*, at Background, Part A(3)(d).)

Furthermore, the record shows that, well prior to the time when Plaintiff complained about Loccisano's comment, Plaintiff's Banking Center had already failed two audits, and both Cherry and Tutiven, who were Plaintiff's managers before Loccisano, gave Plaintiff warnings as a result.  (*See supra*, at Background, Part A(2).)  Given that Defendant had consistently issued warnings to Plaintiff for audit-related performance issues prior to her complaint about Loccisano, and that those warnings were similar or identical to those she received, for the same type of audit problems, after her complaint, no rational jury could find that Plaintiff's final written warning – which, according to Defendants, was one of the bases for her termination – was a pretext for retaliation.  *Slattery*, 248 F.3d at 95 (noting that "gradual adverse job actions [that] began well before the plaintiff had ever engaged in any protected activity," did not give rise to an inference of retaliation); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 658 (2d Cir. 2009) (finding no inference of retaliation raised by second firing where plaintiff's pre-complaint record

of poor performance and prior legitimate firing supported belief that plaintiff would be poor employee); *Dixon v. Int'l Fed'n of Accountants*, No. 09 Civ. 2839 (HB), 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) ("Here, [plaintiff] was subjected to repeated critiques and complaints about her management and performance skills before she ever lodged any complaints about discrimination and, as such, her retaliation claim must be dismissed.").

While Plaintiff claims that Defendant's explanation for her termination "raises an issue of credibility which cannot be resolved on a motion for summary judgment" (Pl. Mem., at 12), Plaintiff does not point to any weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's proffered reasons for her termination. *Kwan*, 737 F.3d at 846-47 (finding that discrepancies and inconsistent explanations by defendant for why plaintiff was terminated, coupled with temporal proximity, created triable issue of fact as to whether plaintiff's complaint was the but-for cause of his termination). Although it appears that Plaintiff received a satisfactory performance review in 2011, and that her reviews had been similar for the previous three years that she worked for Defendant (Pl. Aff. ¶ 5), those reviews were done before the ATM Incident, before the operational investigation revealed problems with Plaintiff's Banking Center, before Plaintiff received poor results on a third independent and routine audit, and before four of Plaintiff's associates complained to Loccisano about Plaintiff's management and treatment of associates. Plaintiff does not put forth any evidence sufficient to create a triable issue of fact as to whether these events actually happened or whether Defendant actually terminated her for any reason other than these collective events.

In light of the undisputed facts in the record, no rational juror could infer that Plaintiff's complaint regarding Loccisano's comment was, in fact, the reason that Plaintiff's employment

was terminated.  Accordingly, summary judgment must be granted to Defendant on Plaintiff's retaliatory termination claims.

## 2.   Retaliatory Disciplinary Warnings

While this is not entirely clear, Plaintiff also seems to suggest that some or all of the disciplinary warnings she received would have been sufficient to "dissuade[] a reasonable worker from making or supporting a charge of discrimination" (*see* Pl. Mem, at 7-8 (quoting *Burlington*, 548 U.S. at 68)), such that those warnings, in themselves, should be seen as material adverse actions, subject to challenge as retaliatory.  Plaintiff, however, has offered no details as to which disciplinary actions she may be seeking to challenge, or as to how those actions, viewed in context of undisputed events, could have discouraged a reasonable employee from engaging in protected activity.  It is thus difficult for this Court to find that Plaintiff has satisfied her burden of demonstrating that any particular disciplinary actions by Defendant could, in fact, be actionable under Title VII or the NYSHRL.

In any event, even if Plaintiff could satisfy her burden of demonstrating that any of her disciplinary warnings were themselves material adverse actions, she has certainly not set forth any evidence capable of showing a causal connection between her complaint regarding Loccisano's derogatory remark and any of the disciplinary warnings.  While certain of those warnings may have been delivered to her shortly after she purportedly complained about Loccisano's remark, there is no dispute that what the warnings most immediately followed were *the events recounted in the warnings*, events that raised inherently serious performance issues and that, in whole or material part, were uncontested.

### 3.     Retaliatory Harassment/Hostile Work Environment

In addition to the discrete retaliatory employment actions discussed above, Plaintiff

complains that she suffered retaliation by way of a hostile work environment after she

complained about Loccisano to Advice & Counsel.

"To establish that a retaliatory hostile work environment constitutes a materially adverse

change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a

plaintiff must satisfy the same standard that governs hostile workplace claims by showing that

the incidents of harassment following complaints were sufficiently continuous and concerted to

have altered the conditions of his [or her] employment."  *Rasco v. BT Radianz*, No. 05 Civ. 7147

(BSJ), 2009 WL 690986, at *15 (S.D.N.Y. Mar. 17, 2009); *Richardson v. New York State Dept.*

*of Correctional Service*, 180 F.3d 426, 446 (2d Cir. 1999) ("We adopt the view that unchecked

retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment

action so as to satisfy the second prong of the retaliation prima facie case."), *abrogated on other*

*grounds by Burlington*, 548 U.S. at 68.[14] "Isolated instances of harassment ordinarily do not rise

---

[14] Some courts have questioned whether the Supreme Court's decision in *Burlington*
altered the standard for retaliatory hostile work environment claims, such that they should no
longer be treated the same as discriminatory hostile work environment claims. *See, e.g.*, *Khan v.*
*HIP Centralized Lab. Servs., Inc.*, No. 03-CV-2411 (DGT), 2007 WL 1011325, at *11 (E.D.N.Y.
Mar. 30, 2007). As discussed previously, *Burlington* effectively broadened the standard for a
"material adverse action" in the retaliation context, by clarifying that, at least in the context of a
suit challenging a discrete employment decision, a plaintiff need not show that the adverse action
altered his or her conditions of employment, but rather only that the action would have dissuaded
a reasonable employee from complaining of discrimination. (*See supra*, at Discussion, Part
II(A).) To establish a hostile work environment, however, it has generally been held that "a
plaintiff must show that the 'incidents of harassment following complaints were sufficiently
continuous and concerted *to have altered conditions of an employee's employment*.'"  *Khan*,
2007 WL 1011325, at *11 (emphasis added). Thus, after *Burlington*, the question was raised
whether "plaintiffs attempting to show a retaliatory hostile work environment could potentially
survive summary judgment by showing that they were subjected to conduct, which although
objectionable enough that it 'might have 'dissuaded a reasonable worker from making or
supporting a charge of discrimination,' did not meet the 'severe or pervasive' threshold

to th[e] level [of a hostile work environment] . . . .  Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or] her working environment." *Cruz*, 202 F.3d at 570 (citations and internal quotation marks omitted).

Factors relevant to determining whether a reasonable jury could find a plaintiff's work environment to have been hostile include:  the frequency of the discriminatory conduct; its severity; whether there were physical threats or humiliation, as opposed to merely offensive utterances; and whether the environment unreasonably interfered with the employee's work performance.  *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment, as they do not change the "terms and conditions of employment").

Plaintiff's hostile work environment claim is premised on a few incidents where Loccisano allegedly made comments that embarrassed Plaintiff or yelled or screamed at her. Specifically, Plaintiff identifies the following incidents of alleged harassment:  Loccisano (a) asking Plaintiff whether she was "nervous" in connection with the ATM Incident on August 12, 2011 (Def. 56.1 Stmt. ¶ 63(a)); (b) ridiculing Plaintiff over her pursuit of a transfer to

---

ordinarily required in hostile work environment claims."  *Id.*  In the years following *Burlington,* "[n]early every decision to address a claim for retaliatory hostile work environment has held that a plaintiff must satisfy the same standard used to evaluate conventional hostile work environment claims; that is, the incidents of harassment following a complaint were sufficiently continuous and severe to have altered the conditions of employment."  *Cajamarca v. Regal Entm't Grp.*, 863 F. Supp. 2d 237, 253-55 (E.D.N.Y. 2012) (collecting cases).  Regardless of this, and even though Plaintiff has analyzed her hostile work environment claim under the traditional hostile work environment test (Pl. Mem., at 12-13), this Court will consider the viability of her claim under both standards.

a different branch (Pl. Aff. ¶ 9); (c) berating Plaintiff, on August 12, 2011, for her lack of

diligence regarding the ATM incident (*id.* ¶ 6); (d) screaming at Plaintiff over the phone, on

August 12, 2011, while Plaintiff had a customer at her desk (*id.* ¶ 7); (e) screaming at Plaintiff

and/or criticizing her on August 13, 2011, for her handling of a staffing situation (*id.* ¶ 8);

(f) saying that Plaintiff was "making believe" that she was coaching an associate, when she was

really focused on the photocopy machine (*id.* ¶ 10); (g) asking Plaintiff, during an October, 2011

managers' meeting, if she was "alright [sic], because it did not seem like [she was] paying

attention," and then asking Plaintiff if she could "you stop texting" (*id.* ¶ 12); and (h) asking

Plaintiff "why are you laughing?" during another conversation between them (Def. 56.1 Stmt.

¶ 63(e)).[15]

It is plain that no rational jury could find that the aforementioned conduct, which

allegedly took place over a three-month period, was sufficiently severe or continuous to meet the

"stringent standard" necessary to make out a hostile work environment claim.  Even assuming

that all of these incidents occurred, they cannot be found, either individually or collectively, to

constitute conduct that "a reasonable person would find hostile or abusive" under the relevant

law.  *Faragher*, 524 U.S. at 787.  Courts have routinely granted summary judgment for

defendants on hostile work environment claims where the plaintiff alleged far worse activity than

that alleged here, including claims where the plaintiff was subjected to regular, explicit hostilities

based on the plaintiff's protected class or activity.  *See, e.g.*, *De La Concha v. Fordham Univ.*,

5 F. Supp. 2d 188, 190 (S.D.N.Y. 1998) (finding supervisor's racially offensive comments over

---

[15] Although Plaintiff's affidavit contains broad references to how Loccisano would "harass" Plaintiff on a daily basis and "scream[] at Plaintiff on a continual basis" (Pl. Aff. ¶¶ 5, 8),  the foregoing are the only examples of claimed harassment that Plaintiff has identified.  Moreover, as noted above, Plaintiff testified, at her deposition, that Loccisano visited the branch once a week and did not yell at her every time that she was there.  (Hahn Dep., at 194-97.)

four or five month period, including use of the word "spic," insufficient to withstand summary

judgment on a hostile work environment claim), *aff'd*, 173 F.3d 843 (2d Cir. 1999); *Bolden v.*

*New York City Hous. Auth.*, No. 96 Civ. 2835 (AGS), 1997 WL 666236, at *1-2 (S.D.N.Y.

Oct. 27, 1997) (finding, as a matter of law, the use of the word "nigger" and five racially

derogatory remarks over a period of six weeks insufficient, without more, to establish the

existence of a hostile work environment); *Stepheny v. Brooklyn Hebrew Sch. for Special*

*Children*, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (co-worker's five utterances of "white

bitch" or some variation thereof to plaintiff over five-month period could not be characterized as

sufficiently severe or pervasive and, as a result, hostile work environment claim failed as a

matter of law).

Here, at best, Plaintiff has put forward her testimony that, on a few occasions, Loccisano

yelled at her, and, on a few other occasions, Loccisano otherwise embarrassed her in front of her

co-workers.  On the record presented – and especially where there is undisputed evidence of

legitimate performance issues (like the ATM Incident) that could reasonably have precipitated

harsh words from a supervisor – no rational fact finder could conclude that Plaintiff's workplace

was permeated with intimidation so "severe" or "pervasive" as to "alter the conditions of her

work environment."  *Rivera*, 743 F.3d at 20.

Nor do Plaintiff's allegations, individually or collectively, rise to the level of a material

adverse action under the general retaliation standard, which, as discussed above, requires

conduct sufficient to dissuade a reasonable worker from engaging in protected activity.  (*See*

*supra*, at Discussion, Part II(A).)  The incidents that Plaintiff identifies fall squarely within the

categories of "trivial harms," or "petty slights or minor annoyances that often take place at work

and that all employees experience," which would not dissuade a reasonable employee from

making a complaint of retaliation.  *Burlington*, 548 U.S. at 68 ("'[P]ersonality conflicts at work

that generate antipathy and snubbing by supervisors and co-workers are not actionable.'"

(quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 669 (3d ed.

1996)); *see also Tepperwien*, 663 F.3d at 571 (finding that comment by supervisor about people

he did not like, followed by pointed stare at plaintiff, was not a material adverse action);

*Martinez v. N.Y.C. Dep't of Educ.*, No. 04-CIV-2728 (LTS) (DFE), 2008 WL 2220638, at *12

(S.D.N.Y. May 27, 2008) ("Petty slights, minor annoyances, personality conflicts that generate

antipathy, snubbing, the sporadic use of abusive language, or a simple lack of good manners,

often experienced at work, do not rise to the level of actionable conduct in a Title VII retaliation

claim.").

Indeed, the Court notes that Plaintiff herself was not dissuaded from making additional

complaints to Advice & Counsel after suffering the alleged harassment.  (*See* Whitelaw Dep.,

Ex. 11, at BANK0417-22 (noting, *inter alia*, complaints made by Plaintiff on October 27 and 28,

2011).)  While not dispositive, as the standard is objective, this itself suggests that the conduct of

which Plaintiff complains did not rise to the level of material adverse action.  *See Levitant v. City

of New York Human Resources Admin.*, 2014 WL 866480, at n.2 (2d Cir. 2014) (noting that

employee was not deterred from making complaints); *Tepperwien*, 663 F.3d at 572 (noting that

employee was not deterred from making complaints).  In light of all of the circumstances,

including the fact that Plaintiff felt uncomfortable with Loccisano's behavior and management

style well before Plaintiff engaged in participated activity, the Court concludes that no

reasonable factfinder could find that Loccisano's conduct toward Plaintiff would have dissuaded

a reasonable employee in Plaintiff's position from complaining of unlawful discrimination or

retaliation, and that Loccisano's alleged behavior thus cannot be considered a "material adverse

action." *See Martinez*, 2008 WL 2220638, at *12 (finding that incidents of supervisor publicly yelling at plaintiff and calling him "shit" constituted petty slights and personality conflicts that were not actionable).

In any event, as discussed previously, two of the three incidents of alleged "yelling" or "screaming" by Loccisano occurred in connection with the ATM Incident, which, based on the unrefuted evidence in the record, was before Loccisano knew about Plaintiff's complaint (*see* Def. 56.1 Stmt. ¶ 26; Pl. 56.1 Stmt. ¶ 26), and Plaintiff has not pointed to any evidence capable of supporting an inference that Loccisano's post-complaint conduct was in any way motivated by Plaintiff's protected activity.  Accordingly, even if any or all of Loccisano's allegedly harassing acts could be considered "material adverse actions," Plaintiff has not demonstrated the existence of a material issue of fact as to whether any of those incidents occurred *because* of her complaint of discrimination, and thus any hostile work environment claim would still fail.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1.    Plaintiff's Title VII and NYSHRL claims against Defendant for (a) discrimination on the basis of national origin, and (b) discriminatory hostile work environment are dismissed without prejudice.

2.    Defendant's motion for summary judgment (Dkt. 31) is granted with respect to Plaintiff's remaining Title VII and NYSHRL claims for retaliation and retaliatory hostile work environment, and those claims are hereby dismissed with prejudice.

The Clerk of the Court is directed to close this case on the Court's Docket.

Dated: New York, New York
      March 31, 2014

                        SO ORDERED

                        DEBRA FREEMAN
                        United States Magistrate Judge

Copies to:

All counsel (via ECF)